**Charles ALBRIGHT, III, et al.**

v.

**THE CITY OF NEW ORLEANS, et al.**

**Nos. 96–0679, 73–629, 97–2523, 97–3926, 98–3012.**

United States District Court, E.D. Louisiana.

April 14, 1999.

524

Frank G. DeSalvo, Frank G. DeSalvo, A Professional Law Corp., New Orleans, LA, for Charles Albright, III, Michael Allsbrook, Forest Austin, Timothy Bayard, Bruce Bond, Sr., Pete Bowen, Albert Bowman, Samuel Bua, Anthony Caprera, John Castelluccio, Randall Chesnut, David Daughtry, Garold Fayard, Sam Gebbia, Walter Gifford, Michael Goodson, Stanley Hoogerwerf, Edward Hirstius, Jeremy Kleinberger, Gary Lee, Isidro Magana, Paul McCaskell, Norman McCord, Jr., Larry Nettles, Michael Pfeiffer, Michael Rice, John Ronguillo, Jay Saacks, Troy Savage, James Scott, Fenner Sedgebeer, David Slicho, Steven Smegal, Leroy Smith, Jr., Larry Stokey, James W. Ward, Clifford Wood, Dennis DeJean, John Favalaro, III, Marjorie Powell, Plaintiffs in 96-CV-679.

Annabelle Hoppe Walker, City Attorney's Office, New Orleans, LA, Franz L. Zibilich, City of New Orleans, New Orleans, LA, for City of New Orleans, defendant in 96-CV-679.

Annabelle Hoppe Walker, City Attorney's Office, New Orleans, LA, for Marc H. Morial, Richard Pennington, Marlin Gusman, Defendants in 96-CV-679.

Ralph D. Dwyer, Jr., Ralph D. Dwyer, Jr., Attorney at Law, New Orleans, LA, for City of New Orleans, Defendant in 73-CV-629.

Frank G. De Salvo, Frank G. DeSalvo, A Professional Law Corp., New Orleans, LA, for Julie Jones Wilson, Samuel Bua, Tyrone Tedesco, Frederick Terluin, Michael Glasser, Stephen Dunn, Earle Frisard, Bruce Bono, David Slicho, Michael Rice, Fenner Sedgebeer, Troy Savage, movants in 73-CV-629.

Michael Richard Allweiss, Suzette Marie Smith, Marynell Lapuyade Piglia, Lowe, Stein, Hoffman, Allweiss & Hauver, New Orleans, LA, for Barry Fletcher, Stephen Dunn, Michael Glasser, Earle J. Frisard, Bruce Little, Plaintiffs in 97-CV-2523.

Avis Marie Russell, Annabelle Hoppe Walker, City Attorney's Office, New Orleans, LA, Franz L. Ziblich, City of New Orleans, New Orleans, LA, for City of New Orleans, Defendant for 97-CV-2523.

Annabelle Hoppe Walker, City Attorney's Office, New Orleans, LA, for Richard Pennington, Defendant in 97-CV-2523.

Annabelle Hoppe Walker, Arlinda Pierce Westbrook, City Attorney's Office, New Orleans, LA, Ralph D. Dwyer, Jr., Ralph D. Dwyer Jr., Attorney at Law, New Orleans, LA, for New Orleans Civil Service Commission, Defendant in 97-CV-2523.

Frank G. DeSalvo, Frank G. DeSalvo, A Professional Law Corp., New Orleans, LA, for, Samuel Bua, Tyrone Tedesco, Frederick Terluin, Michael Glasser, Stephen Dunn, Earle Frisard, Bruce Bono, Michael Rice, Fenner Sedgebeer, Julie Jones Wilson, David Slicho, Troy Savage, Keith McElrath, Adele Benura, Robert Guidry, Joseph Miestchovich, Robert Boyd, Barry Fletcher, Henry Dean, Michael Nuessly, Fredrick Zander, Brian Monteverde, James Gallagher, James Keen, Gregory Elder, Daniel Mack, Jeffrey Jacobson, Gary Gremillion, Robert Nelson, John Bondio, Richard Wheat, Danny Kramer, Jr., Addison Thompson, Samuel Jones, April Querman, John Rice, Wayne Crescioni, Robert Harrison, Terrence Duffy, Bruce Little, Patrick Jones, Ronald Smith, Plaintiffs in 97-CV-3926.

Annabelle Hoppe Walker, City Attorney's Office, New Orleans, LA, for City of New Orleans, Richard Pennington, Marlon Guzman, defendants in 97-CV-3926.

Frank G. DeSalvo, Harry J. Boyer, Jr., Frank G. DeSalvo, A Professional Law Corp., New Orleans, LA, for Paul H. Bolian, Plaintiff in 98-CV-3012.

Arlinda Pierce Westbrook, City Attorney's Office, New Orleans, LA, for City of New Orleans, Marc H. Morial, Richard Pennington, Marlin Gusman, Defendants for 98-CV-3012.

### OPINION AND REASONS

BARBIER, District Judge.

In these consolidated cases, plaintiffs are white New Orleans police officers who seek promotions, back pay and other damages allegedly resulting from (1) violations by the City of New Orleans ("City") of the "Stipulation" added to the *Williams* Consent Decree; or (2) the disparate impact upon white officers of the City's domicile requirement for promotions within the New Orleans Police Department ("NOPD"). In addition to the City itself, also named as defendants are the New Orleans Civil Service Commission ("Commission"), Mayor Marc Morial, Superintendent of Police, Richard Pennington and Chief Administrative Officer for the City, Marlin Gusman.

### I. WILLIAMS LITIGATION AND THE CONSENT DECREE

In 1973, several African–American New Orleans police officers and applicants sought redress for alleged employment discrimination by the City, the Commission and various city and commission offi-

cials in the case of *Larry Williams, et al. v. The City of New Orleans, et al,* Civil Action No. 73–629. As representatives of a class of similarly situated persons, the plaintiffs asserted that the defendants had violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the Thirteenth and Fourteenth Amendments to the United States Constitution. Following years of litigation, the *Williams* plaintiffs, the City and the Commission entered into a Consent Decree signed by this Court on May 26, 1987.

This Consent Decree, which is still in effect today, alters the promotional procedures of the NOPD. The Decree creates a "band system" which places officers in bands or groups according to their scores on the Commission's examination. All candidates falling within a band are deemed to have substantially equal ability. These lists, which are created for the ranks of sergeant, lieutenant and captain, are referred to as "promotional registers." Promotions for each rank are to be made first from the group or band with the highest scores until it is exhausted, and then from the group or band with the second highest scores and so forth until the list expires.[1]

The Consent Decree also creates "supernumerary" positions which can only be filled by African–American police officers. The City agreed to create an additional thirty sergeant positions, twelve lieutenant positions and two captain positions. Promotions to these positions could be filled by a candidate from a lower band without exhausting the previous band if an African–American was being promoted to the position.[2]

Concerned that creation of these supernumerary positions would reduce or dilute the ratios of sergeants, lieutenants and captains within the NOPD, a number of white police officers intervened in the

*Williams* suit. As a result of this intervention, a "Stipulation" or addendum to the Consent Decree was entered on May 26, 1987, between these intervenors, the City and the Commission. The Stipulation requires that the ratios of "nonsupernumerary" sergeants, lieutenants and captains to the total number of officers on the force must be maintained at the levels which existed on October 1, 1981. This means that the ratio of sergeants to the total force must be 14.5%; the ratio of lieutenants to the total force must be 4.9%; and the ratio of captains to the total force must be 1.8%. The Stipulation provides that "a variance from the above percentages lasting no longer than nine (9) months, such as might result from hiring more police officers or from the promotion, termination, or retirement of one or more officers from the rank involved, shall not constitute a violation of this stipulation."

The Consent Decree as to each rank terminates upon the expiration of the second promotional register published following the effective date of the Decree.[3] According to the Rules of the Commission, Rule V, Section 5, each list shall remain in force for at least one year. However, the Director of the Commission may, at his discretion, extend the period for which a list shall remain in force for up to three years. After this three-year period, the Commission may extend this period for up to another two years.

## II. PROCEDURAL HISTORY OF PRESENT CONTROVERSY

On February 27, 1996, in *Charles Albright, et al. v. The City of New Orleans, et al.,* Civil Docket No. 96–679, a number of white police officers ("Albright plaintiffs") filed a complaint seeking a temporary restraining order ("TRO") to prevent the expiration of the sergeant promotional reg-

---

1. Consent Decree, para. IX.

2. Consent Decree, para. VI.

3. Consent Decree, para. XVIII.

ister, which this Court denied.[4] The Albright plaintiffs also alleged that the City's domicile ordinance [5] was not properly validated as a selection procedure in accordance with the *Uniform Guidelines on Employee Selection Procedures (1978)*, 29 CFR § 1607.1 and that the ordinance had an adverse impact on white officers and, therefore, constituted racial discrimination and an unlawful employment practice under 42 U.S.C. § 2000e–2. Finally, the female plaintiffs contended that they were denied promotions based on gender and that this constituted sex discrimination and an unlawful employment practice under 42 U.S.C. § 2000e–2. In response to defendants' Motion to Dismiss, the Court previously dismissed the sex discrimination claims and the claim that the domicile ordinance is a "selection procedure" not properly validated.[6]

On August 13, 1997, another group of white police officers filed *Barry Fletcher, et al. v. The City of New Orleans, et al, Civil Action No.* 97–2523, which was ultimately consolidated with the *Albright* matter. In this new suit, the "Fletcher plaintiffs" sought a TRO and injunctive relief to prevent the expiration of the second lieutenant promotional register.[7] Alleging racial discrimination in the promotional decisions of the NOPD in violation of 42 U.S.C. § 1983, the Fletcher plaintiffs also sought retroactive promotions and monetary damages. On August 14, 1997, the Commission voted to extend the lieutenant promotional register for an additional six months, so the Court denied the TRO request as moot.[8]

On September 25, 1997, the Fletcher plaintiffs amended their complaint to allege that the City had violated the Stipulation to the *Williams* Consent Decree by allowing the ratio of lieutenants to the total number on the police force to fall below the 4.9% ratio required in the Stipulation. On November 20, 1997, the Fletcher plaintiffs amended their complaint to add the Commission as a defendant and again sought a TRO, alleging that, at the request of defendants, the Commission had earlier that day rescinded its August 1997 extension of the promotional register. Plaintiffs claimed they would lose their right to promotions if the register was allowed to expire. The Court issued the

4. See Order of Judge Sear signed February 26, 1996 and oral reasons given in open court on that same day.

5. The ordinance provides in pertinent part:

Sec. 2–974. Prohibition
Except as otherwise specifically authorized in this article:

\* \* \* \* \* \*

(2) No officer or employee of the city shall establish his or her actual domicile outside of the parish or shall fail to maintain continuously his or her domicile within the parish.
Sec. 2–975. Exemptions
(a) Any officer or employee of the city who maintained their actual domicile outside of the parish on February 16, 1995, shall be exempt from the prohibitions of subsection 2–974(2) for so long as the officer or employee maintains their actual domicile at the same physical address and location. ... If any officer or employee exempted by this section qualifies to be appointed to a new position or classification compensated at a higher rate of pay, the officer or employee identified for the new position or classification by the appointing authority shall establish an actual domicile in the parish within 180 days prior to appointment to such position and the exemption granted by this section shall not thereafter apply to the officer or employee.

6. See Memorandum and Order by Judge Sear dated May 19, 1997.

7. Plaintiffs feared that their claims related to the promotional register, which was the second promotional register for the rank of lieutenant, would be barred by the expiration of the register because the Consent Decree provides that it shall terminate as to each rank upon the expiration of the second promotional register for such rank published following the effective date of the Decree and the Stipulation provides that the ratio requirements remain effective until the Consent Decree terminates.

8. The register (issued May 26, 1994) would have expired three years after its publication, but had been previously extended by the Commission for three months.

TRO to prevent the expiration of the lieutenant promotional register on November 20, 1997. At a status conference held on December 12, 1997, all parties agreed to extend the TRO until the merits of the case were resolved.

On December 27, 1997, another group of white police officers ("Bua Plaintiffs") filed suit, *Samuel Bua, et al. v. The City of New Orleans, et al.*, Civil Docket No. 97–3926, raising the same allegations as those raised by the Fletcher plaintiffs. This case was consolidated with the *Albright* and *Fletcher* matters. In addition, Paul Bolian filed suit, *Bolian v. The City of New Orleans, et al.*, Civil Docket No. 98–3012, raising the same allegations as those raised by the Albright plaintiffs. This case was consolidated with *Albright, Fletcher* and *Bua*.[9]

On January 6, 1999, the Court heard oral argument on a number of motions filed by the parties. The Court granted defendants' Motion for Partial Summary Judgment related to the Fletcher and Bua plaintiffs' claims of intentional race discrimination and denied the Commission's

Motion for Summary Judgment. All other motions were taken under advisement.[10]

With this procedural history, these consolidated cases were tried to the Court on April 5, 1999. The issues presented at trial were: (1) in the *Albright* and *Bolian* lawsuits, whether the City's domicile ordinance adversely impacts white candidates for promotion within the NOPD in violation of 42 U.S.C. § 2000e–2(k); and (2) in the *Fletcher* and *Bua* lawsuits, whether the City violated the 4.9% ratio for lieutenants as required by the Stipulation to the *Williams* Consent Decree.

## III. DISPARATE IMPACT

The Albright plaintiffs and Bolian contend that the City's domicile ordinance adversely impacts white candidates for promotion within the police force.[11] The domicile ordinance was first enacted in 1973 during the administration of former Mayor Moon Landrieu and has been amended several times since its inception. The ordinance has previously survived scrutiny by both federal and state courts. See *Police Ass'n of New Orleans v. City of New Orleans*, 100 F.3d 1159 (5th Cir. 1996)[12]; *New Orleans Firefighters Ass'n*

---

**9.** In the case of *Mendoza, et al v. City of New Orleans, et al.*, Civil Docket No. 98–2868, filed September 30, 1998, a number of NOPD police officers alleged violation of the Stipulation as it pertains to the rank of captain. This case was initially consolidated with the cases at issue in this opinion, but later severed for separate trial.

**10.** The Court dismissed the intentional race discrimination claims as barred by prescription because the complaints were filed more than one year after the claims arose. In addition, the Court took a number of other motions under advisement and eventually referred the majority of them, and others that were subsequently filed, to the merits of the case. Those motions referred to the merits were: Motions for Partial Summary Judgment by defendants and the Fletcher plaintiffs (Doc. Nos. 137 and 144) and Motion for Summary Judgment by the Bua plaintiffs (Doc. No. 141) all related to the 4.9% issue; defendants' Motion to Vacate the Injunction (Doc. No. 173); defendants' Motion to Modify the Consent Decree (Doc. No. 180); and defendants' Third Motion for Partial Summary Judgment (Doc. No. 188).

**11.** The Court notes that the ordinance does not prevent qualified applicants from applying for and taking the promotional examination or from passing the examination and being offered a promotion. Only after the police officer is offered a promotion is the ordinance triggered and the police officer must establish his domicile in Orleans Parish within 180 days prior to appointment to the position.

**12.** The Fifth Circuit reversed this Court's denial of the City's Motion to Amend Paragraph X of the Consent Decree to substitute a requirement of domicile for the existing residency requirement. Circuit Judge Wisdom, writing for the unanimous Court held that:

> Paragraph X was included to assure that the decree would not be interpreted to create an exception to the city's generally applicable employment requirements. Those requirements have been amended to require that all city employees maintain their domicile in Orleans Parish to be eligible for promotion. The constitutionality of such a requirement has been consistently upheld.

*Local 632, AFL–CIO v. City of New Orleans,* 590 So.2d 1172 (La.1991); *Police Ass'n of New Orleans v. City of New Orleans,* 649 So.2d 951 (La.1995) (The Supreme Court did strike the ordinance's grandfather clause because it made distinctions between two classes of nondomiciliary employees which did not suitably further any appropriate governmental interest. Otherwise, the Court upheld the domicile requirement.)

 The domicile ordinance, of course, is "race neutral" on its face. Defendants argue that this claim should be dismissed because plaintiffs have failed to show intentional discrimination insofar as the domicile requirement is concerned. However, in *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the Supreme Court recognized that Title VII banned not only intentional discrimination, but also those employment practices that result in "disparate impact." Disparate impact claims involve employment practices "that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group and cannot be justified on business necessity." *Teamsters v. United States,* 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1855 n. 15, 52 L.Ed.2d 396 (1977). A plaintiff proceeding under this theory need not offer proof of discriminatory motive to make out a prima facie case. *Griggs,* 401 U.S. at 430–32, 91 S.Ct. at 853–54. The *Griggs* disparate impact cause of action was later legislatively enacted by Congress as part of the 1991 Civil Rights Act.

42 U.S.C. § 2000e–2 provides in pertinent parts:

(a) Employer practices

It shall be an unlawful employment practice for an employer -

\* \* \* \* \* \*

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex or national origin.

\* \* \* \* \* \*

(k) Burden of proof in disparate impact cases

(1)(A) An unlawful employment practice based on disparate impact is established under this subchapter only if -

(i) a complaining party demonstrates that a respondent uses a particular practice that causes a disparate impact on the basis of race . . . and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity; or

(ii) the complaining party makes the demonstration described in subparagraph (C) with respect to an alternative employment practice and the respondent refuses to adopt such alternative employment practice.

In discussing the requirements of making a prima facie case of disparate impact, the Judiciary Committee stated in House Report No. 102–40(II) that:

. . . statistics may still be used to make a prima facie case of disparate impact. Indeed, such cases usually rely on statistics. But statistics must meet the requirements of the law. Mere statistical imbalance without more will not suffice to establish a prima facie case. The relevant comparison is between the **qualified labor pool** and the group actually selected. Simple reference to the

[Footnote omitted.] The City has a strong interest in requiring its employees to maintain a domicile in Orleans parish. [Footnote omitted.] The City has a reasonable basis for seeking the amendment to the Decree—uniformity of employment require-

ments for all city employees. *Police Ass'n of New Orleans,* 100 F.3d at 1171–72.
Accordingly, following this ruling by the Fifth Circuit, the Consent decree itself, in Paragraph X, requires a domicile in the City as a condition for promotion.

population at large will generally be insufficient.[13] (Emphasis added.)

The Albright plaintiffs and Bolian argue that they have made a prima facie case of disparate impact through the statistical evidence and related testimony of Dr. Lance Seberhagen. Dr. Seberhagen analyzed how the domicile ordinance affected the promotion of sworn officers in general in the police force, and specifically the impact of the ordinance on the ranks of sergeant and lieutenant. Using the domicile zip codes of current sworn officers in the NOPD, he was able to identify officers who lived outside and inside the parish to obtain a general data sample.

To determine the adverse impact on sergeant promotions, Dr. Seberhagen limited the data sample to those sworn officers who had at least three years of experience with the police force; for lieutenants he limited the data sample to those officers with at least one year of experience as a sergeant. His results for sergeant showed that 97.9% of the African–American officers in his data sample "passed" the domicile requirement, whereas only 63.5% of the white officers "passed" the requirement. For lieutenants, 96.9% of the African–American officers and 52.4% of the white officers "passed" the domicile requirement.[14]

With these figures, Dr. Seberhagen applied the "80% Rule" found in the *Uniform Guidelines on Employee Selection Procedures (1978)*, 29 CFR § 1607.4(D), which provides that an adverse impact occurs when the selection rate of one group is less than 80% of the rate of another group. Taking the percentage of white officers who "passed" the domicile requirement and dividing it by the percentage of African–American officers who "passed" the domicile requirement for both sergeants (64.8%) and for lieutenants (54.1%), Dr. Seberhagen determined that the 80% rule was breached and, therefore, the domicile requirement had an adverse impact based on race.

Defendants countered with their expert, Dr. Gerald Barrett to cast doubt on Dr. Seberhagen's analysis and conclusions. While Dr. Barrett raised a number of questions regarding Dr. Seberhagen's methodology, this Court finds the most persuasive to be his conclusion that Dr. Seberhagen used a data sample for both the sergeant and lieutenant ranks that is too broad. Dr. Barrett states in his report, "Dr. Seberhagen admits that his sample included those who were *eligible* to compete for Sergeant [and Lieutenant], not just those who actually did compete." (Emphasis his.) As Dr. Barrett points out, Dr. Seberhagen did not limit his sample pool to those officers who had expressed an interest in a promotion by applying to take the examination, and who actually passed the examination. Thus, Dr. Barrett testified that the analysis performed by Dr. Seberhagen did not follow generally accepted principles of statistical analysis as applied in the field of industrial psychol-

---

13. Although the 1991 Civil Rights Act legislatively overruled certain aspects of the U.S. Supreme Court's decision in *Wards Cove Packing v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), the Committee acknowledged that the Court continued the proper showing of a prima facie case by holding that "the proper comparison [is] between the racial composition of [the at-issue jobs] and the racial composition of the **qualified population** in the relevant labor market." (Emphasis added.) *Wards Cove*, 109 S.Ct. at 2121, quoting *Hazelwood School Dist. v. U.S.*, 433 U.S. 299, 307–308, 97 S.Ct. 2736, 2741–2742, 53 L.Ed.2d 768 (1977).

14. The Court notes that defendants' expert, Dr. Barrett, testified that the domicile requirement is not a "test" which can be validated or which can be "passed" or "failed." According to Dr. Barrett, the domicile ordinance is not a test in any sense because it does not measure intrinsic attributes of an individual; but rather is completely voluntary. Judge Sear previously dismissed plaintiffs' claims which alleged that the domicile ordinance had not been properly validated, finding that the ordinance does not constitute an "employee selection procedure." This Court agrees and finds the testimony of Dr. Barrett supports this conclusion.

ogy.[15]

The Court, being impressed by the testimony of defendants' expert, concludes that the credibility of Dr. Seberhagen was undermined by the testimony and report of Dr. Barrett. The Court finds that Dr. Seberhagen's analysis is flawed. As seen in the Judiciary Committee's report discussed above and the jurisprudence, a qualified labor pool must be used in statistical comparisons for adverse impact purposes. According to Dr. Barrett, the qualified labor pool in this instance would have been the pool of police officers who expressed interest in applying for, and who took and passed the promotional examination, were offered promotions, but were unwilling to comply with the domicile ordinance. Dr. Seberhagen admitted he did not perform such analysis and that he did not have or request the necessary data to permit such an analysis to be made.

Since the Court finds Dr. Seberhagen's analysis flawed, it cannot rely on his testimony and report. Plaintiffs have presented no other evidence in support of the adverse impact claim and, therefore, have failed to meet their burden of establishing a prima facie case of adverse impact. 42 U.S.C. § 2000e–2(k)(1)(A)(i). Accordingly, the Court finds in favor of the defendants in the Albright and Bolian lawsuits.

## IV. VIOLATION OF STIPULATION

The Fletcher and Bua plaintiffs contend that the City has been in violation of the 4.9% ratio requirement for lieutenants since April 1997 and that the violation has continued well beyond the nine-month variance period allowed in the Stipulation. The City admits that the number of lieutenants on occasion has fallen below the 4.9% ratio, but argues that each such variance was corrected by subsequent promotions prior to the running of the nine-month period allowed before a violation of the Stipulation occurred. While the figures provided by the City of New Orleans show that the ratio of lieutenants did fall below the 4.9% ratio required by the Stipulation, the concern of this Court is more focused on the manner in which the procedural path of this case gave rise to this claim.

The lieutenant promotional register which is the subject of this litigation was created on May 26, 1994, and is the second register for lieutenant under the Consent Decree.[16] When this second promotional register expires, the Consent Decree and Stipulation will no longer apply to the rank of lieutenant. The register was due to expire on August 31, 1997, but the Commission granted a six-month extension at its August 14, 1997 meeting. However, on November 20, 1997, the Commission rescinded its earlier decision to extend the life of the list past August 1997. Plaintiffs made their second request for a TRO on November 20, 1997. Without the TRO, the register would have expired and the Consent Decree and Stipulation, insofar as it applied to the position of lieutenant, would have terminated prior to February

**15.** Both Dr. Seberhagen and Dr. Barrett were qualified and accepted as experts in "industrial psychology." The Court, however, was more impressed with the qualifications, background and experience of Dr. Barrett in the particular field of expertise required in this case.

**16.** This list resulted from an examination process which began in May 1992, with an examination based on performance and testing criteria formulated in late 1991. This list contained 104 candidates assigned to five different bands. The first promotions from this list were made on March 3, 1995, and through subsequent promotions, bands one through three were exhausted. Plaintiffs are members of bands four and five. Defendants suggest that this list is now stale and that if any promotions are required, they should be allowed to promote from a newly developed list based upon New Orleans Police Superintendent Richard Pennington's reform and restructuring of the department to modernize its outmoded structure. The Court notes that following an October 1998 Civil Service Commission examination, a new promotional list for lieutenant has been produced but has not been published pending the outcome of this litigation.

1988, the earliest the city could have been in violation of the Stipulation.[17]

Since the TRO effectively created the Fletcher and Bua plaintiffs' claim of a violation of the 4.9% ratio requirement, this Court will review whether the TRO was improvidently issued. In a minute entry dated December 17, 1997, the Court ordered that the hearing on the preliminary injunction was consolidated with the hearing on the permanent injunction as well as the trial on the merits. In addition, the Court referred to the merits defendants' Motion to Vacate Injunction.

■ Temporary restraining orders and preliminary injunctions are extraordinary relief and rarely issued. Under Fed. R.Civ.P. 65, a temporary restraining order or preliminary injunction is available only where the mover shows: 1) a substantial likelihood of success on the merits; 2) a substantial threat that failure to grant the injunction will result in irreparable injury; 3) that the threatened injury outweighs any damage that the injunction may cause the opposing party; and 4) that the injunction will not disserve the public interest. *Allied Marketing Group, Inc. v. CDL Marketing, Inc.*, 878 F.2d 806 (5th Cir. 1989).

■ In their application for the TRO, the Fletcher plaintiffs alleged that they would be irreparably harmed by the termination of the lieutenant register because they "may be deprived of their right to a promotion to the rank of Lieutenant...." Based on this assertion, the TRO was granted. The Court notes that in the Albright case, Judge Sear denied a TRO request to prevent the sergeant promotional register from expiring. He con-

cluded that no irreparable harm would occur without the injunctive relief because the Court could make the plaintiffs whole if they were successful on the merits. This Court agrees with Judge Sear's conclusion and reasoning. The Fletcher plaintiffs failed to make a showing of irreparable injury and the TRO was improvidently granted. Accordingly, defendants' Motion to Vacate Injunction is granted and the TRO previously issued is hereby vacated.

There was no evidence presented at trial to show that the Commission could not rescind its August 27, 1997 vote to extend the promotional register. In fact, there is nothing in the law, either federal or state, or in the Commission's rules which required an extension of the promotional register.[18] Neither the *Williams* Consent Decree nor the Stipulation requires that the promotional register be extended. Having granted the Motion to Vacate Injunction, the second lieutenant promotional register expired either on August 31, 1997 (the expiration date prior to the six-month extension) or on November 20, 1997 (the date the extension was rescinded by the Commission). Regardless of which date signaled the expiration of the promotional register, viewing the evidence in the light most favorable to the Fletcher and Bua plaintiffs, the City did not violate the Consent Decree or the Stipulation—the earliest a violation could have occurred under plaintiffs' calculations is February 1998. With the expiration of the second lieutenant promotional list, the Fletcher and Bua plaintiffs' claim of a violation of the 4.9% ratio requirement is no longer viable and, therefore, the Court finds in favor of defendants in the Fletcher and Bua lawsuits.

---

**17.** Viewing the evidence and all inferences in the light most favorable to plaintiffs, the earliest date that the number of lieutenants fell below the required 4.9% ratio rate was April 1997. Since the Stipulation allows for a variance "lasting no longer than nine (9) months," the earliest date the City could have been in violation of the Stipulation was February 1998.

**18.** The rules of the Civil Service Commission clearly provide that it is totally within the discretion of the Director in the first instance, and after three years the Civil Service Commission, to extend or not extend any promotional registers. J. Michael Doyle, the Director of the Civil Service Commission, testified that other promotional registers have been allowed to expire without extension.

The Court further declares that the Consent Decree and Stipulation have terminated as to the position of lieutenant.[19]

## V. CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that judgment be entered in favor of defendants dismissing plaintiffs' claims with prejudice in the matters of *Albright, et al. v. The City of New Orleans, et al.,* Civil Docket No. 96–679 and *Bolian v. The City of New Orleans et al,* Civil Docket No. 98–3012.

**IT IS FURTHER ORDERED** that defendants' **MOTION TO VACATE INJUNCTION** (docket No. 173) should be and is hereby GRANTED. With the expiration of the second lieutenant promotional register, the *Williams* Consent Decree and the Stipulation are hereby declared **TERMINATED** as to the position of lieutenant.

IT IS FURTHER ORDERED that judgment be entered in favor of defendants dismissing plaintiffs' claims with prejudice in the matters of *Fletcher et al v. The City of New Orleans et al.,* Civil Docket No. 97–2523 and *Bua et al. v. The City of New Orleans et al.,* Civil Docket No. 97–3926.

---

**19.** The Consent Decree and Stipulation have previously terminated as to the position of sergeant. See order of Judge Sear entered on May 19, 1998.